**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING**

**DONNA LYNN BOLYARD MOORE,**

Plaintiff**,**

v.

**CIVIL ACTION NO.: 5:16-CV-184**
**(JUDGE STAMP)**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

Defendant.

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

On December 9, 2016, Plaintiff Donna Lynn Bolyard Moore ("Plaintiff"), by counsel Brian Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security[1] ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).  On February 10, 2017, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 6; Admin. R., ECF No. 7). On March 6, 2017, and April 5, 2017, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 11).  Following review of the motions by the parties and the

---

[1] After this suit was filed, but before this Order was entered, Nancy A. Berryhill replaced Commissioner Carolyn W. Colvin as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule 25(d), Fed. R. Civ. P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   <u>PROCEDURAL HISTORY</u>

On September 19, 2013, Plaintiff protectively filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on July 30, 2013. (R. 200).  Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2017 (R. 222). This claim was initially denied on December 23, 2013 (R. 105) and denied again upon reconsideration on March 13, 2014 (R. 131).  On March 26, 2014, Plaintiff filed a written request for a hearing (R. 158), which was held before United States Administrative Law Judge ("ALJ") Nikki Hall on October 8, 2015 in Morgantown, West Virginia. (R. 39).  Plaintiff, represented by counsel Jennifer LaRosa, Esq., appeared and testified, as did Mary Beth Kopar, an impartial vocational expert. (<u>Id.</u>). On January 12, 2016, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 21). On November 2, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.   <u>BACKGROUND</u>

### A.   Personal History

Plaintiff was born on September 14, 1963, and was forty-nine (49) years old at the time she filed her first SSI claim. (R. 200). She completed two years of college  (R. 234). Plaintiff's prior work experience included working in advertising sales at a newspaper. (R. 225). She was married at the time she filed her initial claim (R. 200) and was married (R. 45) at the time of the

administrative hearing. (R. 39). She has no dependent children. (R. 45). Plaintiff alleges disability based on rheumatoid arthritis, psoriatic arthritis, fibromyalgia, hearing loss, high blood pressure, diabetes, restless leg syndrome, and severe dry eye syndrome. (R. 86).

**B.  Medical History**

The undersigned has reviewed the entirety of this record, including medical opinions, treatment notes, and test results from various providers and facilities. However, as Plaintiff's arguments do not turn on the medical evidence, and for the sake of brevity and relevance, the entirety of the medical evidence contained in the record is not related at length. Rather, Plaintiff's relevant treatment history is reviewed, with opinions specifically addressed below.

**1.  Medical History Pre-Dating Alleged Onset Date of** July 30, 2013

Plaintiff began seeing Clifford E. Bickerton, D.C., for chiropractic treatment of aches in her neck and upper dorsals on May 12, 1986. (R. 812). Dr. Bickerton noted crepitation in Plaintiff's upper spine when rotating her shoulders, limited rotation, pain when rotating her head, and left earache. (R. 813). Plaintiff also had bad headaches, located frontally and on the top of her head. Id. In August of 1997, Dr. Bickerton noted Plaintiff's movement had increased and she was doing well and working without pain. (R. 817). Plaintiff returned to Dr. Bickerton in fall 1998 complaining again of aches in her neck, the back of her head, and her lumbrosacral spine. Id. Dr. Bickerton did some adjustments. Id. Plaintiff returned in 2009 complaining of cervical and upper dorsal pain. (R. 818). She saw Dr. Bickerton a few more times in the Fall of 2009, reporting  improvement after adjustment, but also that the aches tended to return after a while. Id. In July 2010 Plaintiff returned to Dr. Bickerton experiencing another flare-up, including neck and back pain, back spasms, decreased motion, joint pain, abnormal curvature, and degenerative joint disease. (R. 823). Dr. Bickerton's diagnoses included "thoracic or lumbosacral neuritis or

radiculitis, unspecified" and "facet syndrome." Id. Dr. Bickerton adjusted Plaintiff's C2, T2, T6, L5, and upper right sacroiliac joint. Id.

Plaintiff was treated at Advantage Health and Wellness in September 2011 for psoriatic arthritis, reporting that her symptoms worsened a few weeks prior. (R. 833). She reported pain in her lower back after extended walking. Id.  Plaintiff returned to Dr. Bickerton in August 2012 complaining of lumps and stiffness in her neck and shoulders. (R. 822). Diagnoses at that visit included "closed dislocation, fifth cervical vertebra" and "degeneration of cervical intervertebral disc." (R. 825). Adjustment and interferential current were applied. Id. In January 2013, Plaintiff returned with flare-up and neck sprain, again treated with adjustment and interferential current. (R. 828).

Plaintiff began seeing Neurologist Adnan Alghadban, M.D. on June 18, 2010 upon referral. (R. 473). Her complaints included pain and numbness in upper and lower extremities for the last few months, recently worsening. Id. Plaintiff had been on Embrel injections previously, but stopped those "a few years ago." Dr. Alghadban restarted Plaintiff Embrel injections, prescribed Hydrocodone for pain and Voltaren (an anti-inflammatory medication), and did trigger point injections (R. 473-77). Dr. Alghadban referred Plaintiff to Dr. Hornsby for rheumatology, noting that she had already been seen in orthopedics. (R. 473).

Plaintiff presented to Shelly Kafka, M.D. at Mountain State Rheumatology on September 13, 2010 pursuant to referral. (R. 768). Plaintiff's demeanor was noted as "tearful." (R. 804). Musculoskeletal examination revealed tenderness over cervical and lumbar joints, shoulders, elbows, wrists, metacarpophalangeal joints, knees, and ankles; Plaintiff's proximal interphalangeal joints evidenced both tenderness and swelling on the right side. (R. 804). Dr. Kafka assessed psoriatic arthritis and fibromyalgia. Id. Dr. Kafka noted that Plaintiff "cannot

afford Humera," so she prescribed Naproxen, and noted "will try to [obtain] pre-auth[orization] for Remicade. (R. 775). At follow-ups with Dr. Kafka, Plaintiff continued to complain of severe pain (R"9/10") and evidenced swelling in her metacarpophalangeal joints (R. 807, 810); and pain in the wrist and inside joints of her left hand (R. 809).

Because Plaintiff's pain was treated with conservative measures and had no significant improvement, Dr. Alghadban completed cervical injections in September 2012 at facet joint C5-6 and C4-5 levels bilaterally. (R. 450). In November 2012, Dr. Alghadban completed bilateral occipital nerve block injections for Plaintiff's headaches when more conservative treatment failed (R. 456), and started her on Topamax for her headaches as well. (R. 457). By February 2013, Plaintiff was prescribed Percocet for pain. (R. 458). In April 2013 Plaintiff received additional injections in her tendon for tendonitis (R. 459), and bilateral shoulder injections for arthritis pain. (R. 460).

### 2.  Medical History Post-Dating Alleged Onset Date of July 30, 2013

Dr. Alghadban performed a left knee injection in August 2013. (R. 464-5). On August 27, 2013, Dr. Alghadban wrote a letter opining that Plaintiff:

> has rheumatoid arthritis, psoriatic arthritis and fibromyalgia. She is on medications, Enbrel and anti-inflammatory medications, and she gets a steroid injection. She is also on pain medications. She is very limited due to her arthritis in terms of walking, sitting or standing.

(R. 466). Dr. Alghadban performed another tendon injection in January 2014. (R. 492).

Imaging studies on July 3, 2014 revealed no evidence of articular erosions of inflammatory arthritis. (R. 527). Rather, x-rays of Plaintiff's thoracic spine showed "prominently developed" endplate osteophytes (bone spurs) on the right ventral aspect of the T6-T10 vertebral levels. (R. 528). Plaintiff was seen at Pinewood Medical Center on July 14, 2014 to review imaging studies. Progress notes stated that Plaintiff:

saw [] rheumatology [] and was told that she had DISH [diffuse idiopathic skeletal hyperstosis] in [her thoracic] spine, but there was no evidence of psoriatic arthritis or rheumatoid arthritis. She does have severe osteoarthritis and is starting to get some deformity of her fingers. . . . Since she does not have psoriatic arthritis, she is not on her Enbrel, which did help her psoriasis of her fingernails when Dr. Jeffrey Jackson gave it to her in dermatology. She said she hurts all over in every bone of her body and also in all of her muscles and it is getting to where she cannot pick her feet up when she walks. She said she hides this from her husband since he was involved in a severe motorcycle accident not long ago. . . . . She said FLECTOR patches do help her, but her insurance does not cover them. . . .  She has a history of depression and RLS.
OBJECTIVE: Vital signs stable, no acute distress noted. She does seem to have stiffer joints when moving around from the exam table to the floor. Especially her hips seem to be stiff. She does have psoriasis of all of her fingernails. She has tenderness all over her body to palpation. Her hair looks thinner than it did several months ago.

(R. 543). Certified Nurse Practitioner Judy Lipscomb's treatment plan included diclofenac gel, calcium and magnesium for arthralgia, referral to Dr. Jackson to restart Embrel, increased Glucophage for diabetes, restarting on vitamin D for deficiency, and physical therapy for DISH of thoracic spine. Id.

In July 2014, Plaintiff was seen by Jeffrey Jackson, M.D. with Mountain State Medical Specialties for psoriasis on her fingernails. (R. 570). Dr. Jackson restarted Plaintiff's Embrel injections (R. 567), noting they were effective in keeping her "mostly clear." (R. 563).

Plaintiff tried physical therapy at Grafton City Hospital from July 21, 2014 through August 27, 2014. (R. 514-525, 529-531, 592-626). At initial assessment, she reported pain at nine or ten out of ten in all areas constantly. (R. 523). She reported that she had stopped Embrel in January per her neurologist. Id. She reported pain with standing, sitting, and lying; sweeping, mopping, vacuuming, reading, laundry, and dishes; and trouble with getting in and out of a car, climbing steps, and balance. Id. She reported relief from medications and massage, and temporary relief with heat or ice. Id. Plaintiff was seen by physical therapist Rayler Mace, P.T. who noted Plaintiff had poor to fair posture, with decreased lumbar lordosis and increased kyphosis in the upper thoracic spine. Id. Range of motion testing of the cervical spine revealed

6

no loss at flexion, maximum loss at extension, minimum loss at SB, and moderate loss at rotation. Id. Plaintiff's prognosis was "guarded . . . due to increased pain in all joints and spine." (R. 524). Muscle strength in hips was three out of five (3/5); Plaintiff's gait was antalgic with decreased step length and height, decreased trunk rotation, and decreased arm swing. (R. 531). Transfers, strength, balance, range of movement, joint mobility, and function were all impaired. Id. Plaintiff's treatment plan included manual therapy in conjunction with therapeutic exercises and activities. Id.

Physical therapist Jeff Sapp PTA noted at next visit on August 1, 2014 that Plaintiff continued to have pain "all over her neck and back." (R. 522). Upon exercise, Plaintiff experienced a "steady increase in [low back pain] that progressed to a sharp pain towards the end of the trial," but that subsided afterward with increased mobility. Id. She reported feeling better after with decreased pain overall at the next visit on August 4, 2014 (R. 521). By August 6, 2014 she reported another flare-up, with the physical therapist noting major loss of range of motion in the cervical spine on retraction, major loss on extension, moderate loss on side bend and rotation (right), and minimum loss on flexion. (R. 520). Plaintiff's thoracic spine evidenced moderate loss at flexion and extension, and major loss at rotation. Id. On August 11, 2014, Plaintiff reported improved symptoms after a recent trigger point injection with Dr. Alghadban, but also reported a renewed occipital headache and tightness in her shoulder blades. Id. Plaintiff was doing "a little better" on August 15, 2014, but continued to evidence range of motion deficits. (R. 518). At her last visit on August 27, 2014, she reported "hurting pretty bad" in her upper right trapezoid region. (R. 514). Continued decreased motion of spine was noted, with a two out of six (2/6) on the Paris Scale. Id.

In September 2014 Plaintiff returned to Pinewood for follow-up on depression and medication refills. (R. 545). She reported that her pain was "constant and [] getting worse every day." Id. N.P. Lipscomb ordered Lidoderm patches and increased Plaintiff's baclofen dose to twenty milligrams, noting that ten milligrams "was not controlling her pain completely." Id. At next follow-up in December 2014, Plaintiff continued to complain of "severe myalgia and arthralgia," for which she was given Flector patches and Metanx samples for peripheral neuropathy. (R. 546). At follow-up in April 2015, Plaintiff reported having left her husband two days ago because he "has permanent brain damage from a motorcycle accident and is being verbally abusive to her." (R. 549). N.P. Lipscomb noted Plaintiff's history of depression and anxiety, and that Plaintiff's other providers had "suggested she see a psychiatrist," and referred her to Dr. Nugent at Summit Center for counseling. (R. 549).

In October 2014, Plaintiff returned to Dr. Alghadban for follow-up. (R. 582). Dr. Alghadban noted that a recent "EMG nerve conduction study was suggestive of neuropathy," and started Plaintiff on Neurontin. Id. She also received another bilateral occipital nerve block at that visit (R. 583), and again in April 2015. (R. 586). She continued to go to physical therapy at Grafton City Hospital, and continued to report paint and headaches throughout fall and winter of 2014 and into 2015. In February 2015, Plaintiff reported pain at eight out of ten (8/10), always in the neck but now in the shoulder blades, too. (R. 603). She reported that her TENS unit relieves the pain for about an hour after use. Id. Physical therapy progress notes in March 2015 note "subjectively little to no change in her overall symptoms" despite compliance, and that "chronic pain is starting to make her feel depressed." (R. 600). Tom Copeland, PTA opined that there will "little gains to note in re: decreasing pain level or increasing functional activity." (R. 599). Plaintiff "would benefit from a pain clinic consult for possible trigger point injections," and

observed that Plaintiff was "still waiting on her [doctor] to contact her about the pain clinic." (R. 600).

By June 2015 Plaintiff reported "constant severe pain" rated at "15/10" at times. (R. 598). Accordingly, Plaintiff had a consult with Russell Biundo, M.D. at WVU Neurosurgery, Spine, and Pain Center on July 31, 2015. (R. 756). Dr. Biundo reviewed imaging studies and noted "degenerative changes and some bridging" in the thoracic spine, degenerative disease in the lumbosacral spine. Id. X-rays of the sacroiliac joint, hands, and wrist were "unremarkable." Id. Dr. Biundo felt that Plaintiff's decreased range of motion of all joints seems consistent with either psoriatic arthritis or a systemic rheumatological disorder. Id. Dr. Biundo recommended Plaintiff see Dr. Hawkinberry for pain control, and six weeks of physical/pool therapy, after which they could reassess. Id.

### 3.  Medical Reports/Opinions

#### a.  *Disability Determination at the Initial Level*

On December 21, 2013, agency reviewer Subhash Gajendragadkar, M.D. reviewed Plaintiff's records and completed physical residual functional capacity ("RFC") assessment. (R. 90-92). Gajendragadkar found the following exertional limitations: Plaintiff could frequently lift and/or carry ten (10) pounds; occasionally lift and/or carry twenty (20) pounds; stand and walk for about four (4) hours in an eight (8) hour workday; sit for about six (6) hours in an eight (8) hour workday; and could engage in unlimited pushing and/or pulling (within her weight restrictions for lifting and carrying). (R. 90). Gajendragadkar noted that the limitations he articulated were supported by the "severity of [rheumatoid arthritis and] psoriatic arthropathy." (R. 91).

As to postural limitations, Gajendragadkar found that Plaintiff could occasionally climb ramps, and stairs; occasionally climb ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. (R. 91). No manipulative, visual, or communicative limitations were found. Id. As to environmental limitations, Plaintiff could have unlimited exposure to extreme heat and noise; should avoid concentrated exposure to extreme cold, wetness, humidity, vibration, and fumes, odors, dusts, gases, poor ventilations, etc.; and avoid even moderate exposure to hazards. (R. 91).

On December 20, 2013, agency reviewer Paula Bickham, Ph.D., reviewed Plaintiff's records and completed psychiatric review technique ("PRT") assessment. (R. 88). Bickham found mild difficulties in maintaining concentration, persistence, or pace, and no significant limitations in Plaintiff's ability to maintain social functioning and no restriction of activities of daily living. Id. Her narrative explanation stated that

> [Plaintiff] appears credible. The claimant is being prescribed medication from her pcp for depression although comments in the MER indicates depression and anxiety. In the recent ROC of 12/20/13, the claimant reported that she no longer believes she needs the medication. She alleged limits to concentration and memory on the AFR Claimant reported to the examiner that she believed her memory issues were menopause related and she is doing better since stopping work ADLs do not reflect severe limits w[ith] functioning. Nonsevere Impairment.

(R. 88-89).

### b. *Disability Determination at the Reconsideration Level*

On March 11, 2014, agency reviewer Rogelio Lim, Ph.D. reviewed the prior PRT assessment and affirmed it as written, adding only the word "affirm." (R. 116). On March 5, 2014, agency reviewer Joseph Richard, Ph.D. reviewed the prior PRT assessment and affirmed it as written, noting "there is no new significant [medical evidence] data to refute the evaluation [and] conclusions of 12/23/13 and that evaluation are [sic] affirmed as written. (R. 113).

### c.  Treating Source Statement

On September 23, 2013, Adnan Alghadban, M.D. completed a Medical Review Team (MRT) Physician's Summary pursuant to an application for Medicaid. (R. 478-479). Dr. Alghadban's diagnoses included lupus, psoriatic arthritis, and another condition that was illegible. (R. 478). He opined that Plaintiff's incapacity/disability was expected to last for ten (10) years, and that Plaintiff's prognosis was "guarded." Id. Dr. Alghadban opined that Plaintiff was limited to lifting no more than twenty-five pounds, and could not stand for more than fifteen minutes. Id.

### d.  Internal Medicine Consultative Examination

On November 20, 2013, Himanshu Paliwal, M.D. completed a consultative examination (R. 480-487). Dr. Paliwal noted that due to Plaintiff's arthritis, she complained of "various joint pains including neck, lumbrosacral, shoulder and hand, [as well as] pain in [the] small joints of [her] hand and wrist." Id. Plaintiff reported that pain and swelling in her hands made it hard for her to work. (R. 481). Though Plaintiff seemed to be doing better since starting on medication, she had "good and bad days." Id. She also reported constant dull, aching neck and low back pain from fibromyalgia. Id. She reported being "able to do most of [her] daily activities except work, which requires her to bend or be on her knees." Id. Results of a physical examination were generally normal, with the exception of Plaintiff's nails. (R. 482) ("distal half of nails are opaque white and separated from nail bed."). Dr. Paliwal assessed obesity, psoriasis, psoriatic nails, rheumatoid arthritis, psoriatic arthropathy, lumbago, cervicalgia, fibromyalgia, and chronic fatigue syndrome. (R. 483-83).

### e.  Other Opinion Evidence

Plaintiff returned to Dr. Biundo for follow-up in September 2015. (R. 763-764). In

response to Plaintiff's request for "a letter regarding her ability to work/question about possible disability," Dr. Biundo noted the following:

> Regarding disability, the patient would be pain limited in terms of her ability to work manual type labor, but she could conceivably do a job/desk type work. I informed her if she wished to pursue disability, she would most likely need to be referred to an occupation medicine doctor for further evaluation and filling out of her paperwork. She declines that for now. She agrees to continue with physical therapy, and we will see her in 3 months or sooner if any problems. The patient is comfortable with these recommendations.

(R. 764).

### f.   Treating Psychological Source

On August 13, 2015, Plaintiff's treating psychologist Dr. Dana Nugent, Ed.D. wrote a letter to "address [Plaintiff's] ability to participate in gainful employment." (R. 533). Dr. Nugent stated that Plaintiff had been diagnosed with Major Depressive Disorder, Moderate, for which she received treatment including psychotherapy since May 28, 2015. Id. Dr. Nugent elaborated that Plaintiff:

> remains quite depressed due to the severity of her back pain, which is the consequence of her Psoriatic Arthritis. I have tried to work on increasing her activity level, including increasing social interaction and enjoyable activities. However, even visiting a friend is often too painful for her, because she is not able to alternate sitting and lying down as she needs. The tremendous loss of functioning the arthritis has caused has precipitated extended grieving over what she can no longer do. She has difficulty replacing former activities with new, more sedentary ones, like reading, because she can't even look down for long, because of her neck pain. We are addressing her mood disorder with medication, but so far are not seeing any improvement. If the current medical interventions she is pursuing reduce her back pain, we will have more to work with to address her depression, but we cannot anticipate if that will happen.

(R. 533).

### g.   Treating Rheumatological Source

On February 24, 2016, Dr. Hornsby wrote a letter stating Plaintiff's diagnoses as "chronic low back pain, and [imaging] of [her] thoracic spine show changes most consisted with Diffuse Idiopathic Skeletal Hyperostosis (DISH)." (R. 840).

**C.      Testimonial Evidence**

At the ALJ hearing held on October 8, 2015,[2] Plaintiff testified that she was married and had no dependent children. (R. 45). She has no income; she and her husband subsist on his disability payments. Id. She receives food stamps and a medical card (Medicaid). (R. 48). She obtained an associate's degree as a medical assistant. (R. 47).

Plaintiff testified that she had been working up until about a week before she decided to apply for disability. (R. 48-49). She found herself going home throughout the day, once or twice a month at first. Id. Eventually, it got to the point where she was going home a couple of days every week. Id. Her boss told her that she could not "keep doing that, that [she needed] to face facts, that [she was] disabled and [] can't keep [] going home in the middle of [the] day." (R. 49). She testified that her condition had not particularly changed in the week between leaving her job and applying for disability. Id. Plaintiff testified that, rather, "Mentally, I couldn't face facts, so finally when I realized that I am in dire pain and I can't continue that, that's whenever I just decided I had to face facts." Id.

Plaintiff testified that she had worked for the Mountaineer newspaper, and that her work history report accurately summarized her work there. (R. 50). Plaintiff testified in her own words that she feels she cannot work because:

> most of my day, day and night, I'm in -- I am in severe pain. I can't hardly use my fingers, I can't hardly I can't even fix dinner like I used to. There's a lot of things that I used to do that I can't do anymore. And even if I try, my body, I just can't. My back is in such a mess and such pain that I just can't. I can't sit at a desk, I can't look down, I can't even hardly read a book.

(R. 51). As to her hands, Plaintiff testified that her "knuckles are going one way and [her] fingers are going the other [which] mak[es] it impossible to open things up or hold a knife to peel a potato or anything like that. And they hurt really bad." Id. This started about a year to a year and

---

[2] Plaintiff was represented at the hearing before the ALJ by Jennifer La Rosa. (R. 40).

a half ago. (R. 52). As to her back pain, Plaintiff testified that started getting bad around August. Id.  She described her back pain as starting "right below the base of [her] skull, and [] between [her] shoulder blades and [her] very low tailbone." Id. She testified that she at times will have limited movement and will not be able to move a certain way or reach for things. Id. She described the pain as "excruciating," stating "I'm at number 10 a lot." Id. However, Plaintiff clarified that "sometimes it is worse than other times," and it is not always that bad. (R. 53).

Plaintiff testified that she had tried physical therapy for probably three months or more, including deep tissue massage and range of motion machines, but those did not work or give her any more motion. Id.  She was currently doing water therapy, and had five to six visits so far; though she had not noticed any improvement with that, either. (R. 56). She currently takes Hydrocodone and uses Flector patches for pain. Id. Plaintiff testified that she has discussed going to pain management to try to manage her pain with her doctors, but no surgeries have been recommended. (R. 57).

Plaintiff testified that she could walk for probably about two minutes before she "start[ed] feeling the back pain." (R. 56). She could stand for about five minutes and sit for about fifteen minutes before her back bothers her. Id. Plaintiff estimated she could lift ten pounds. Id.

Plaintiff noted that although her diabetes had not been controlled in the past, it was "starting to be more controlled" since she started taking Novolog in addition to Lantus. (R. 58). Her sugar levels are typically "high," but are lower than they have been in the past. Id.  When her sugar levels get high, she feels "dizzy and spacey, like [she] can't think;" her mouth gets dry and she starts shaking a little bit. (R. 59). Plaintiff testified that this has been happening more frequently, "probably every other day." Id. Plaintiff testified that her acid reflux (GERD) and blood pressure are controlled with medications. (R. 63).

14

Plaintiff sees Dr. Alghadban for both headaches and neuropathy, which affects her most in her feet. (R. 59). Her neuropathy affects her feet, and causes tingling and sharp pain – "feeling like my feet are cut" – when she walks on them. <u>Id.</u> She has had these symptoms for about a year. <u>Id.</u> She takes Neurontin for her neuropathy, and also walks on the sides of her feet so that the feelings are not as intense. <u>Id.</u> As to her migraine headaches, Plaintiff has a migraine "maybe once every other month," typically lasting for a day or more. (R. 62). Dr. Alghadban gives her injections to treat them; he used to prescribe medication, but Plaintiff does not take it any more because it made her "sick." <u>Id.</u> When she has a migraine, she puts on an eye mask and lays down in a dark room. <u>Id.</u>   Plaintiff stated that she thinks her migraines are exacerbated by her neck pain, for which she gets occipital nerve blocks – most recently the previous month. (R. 63).

Plaintiff gets treatment at United Summit Center for depression. (R. 60). In addition to seeing a counselor weekly and a psychiatrist once a month, she is also prescribed Abilify, Celexa, and Trazodone. <u>Id.</u> There have been a few weeks where she has had to cancel her appointment because she "just couldn't get dressed." (R. 70). Her depression symptoms include crying all of the time, feeling like everything is at its worst, and feeling extremely anxious and shaky. (R. 61). Plaintiff stated that "there's times I can't even hardly get out of bed and get dressed. I just can't do it." <u>Id.</u>   From a social standpoint, Plaintiff stated her depression causes her to not want to be around anyone and she finds it easier to be alone. <u>Id.</u>

Plaintiff testified that she used to cook big dinners and loved to cook, but she has no interest in cooking or eating any more. <u>Id.</u> She has had these symptoms for about four months. <u>Id.</u> It had been "about five months" since she cooked a family meal; the most she might make now is a grilled cheese. (R. 64). She no longer cleans; her daughter has been doing it for the past couple of years. (R. 65). She is able to "dust a little bit," but cannot sweep, mop, or vacuum. <u>Id.</u>

She goes shopping two to three times a week, close to home, for basics like snack foods, milk, cereal, bread, and lunch meat. Id. Her husband, daughter, and a friend help with shopping. Id. She has a driver's license, but does not drive much – "maybe two or three days a week, not very much, close to home." (R. 46). She has a computer at home but stopped using it "probably about a year and a half ago." (R. 47). She checks email or gets on Facebook with her cell phone. Id.

Plaintiff testified that she tries to read, but has to be on her back because she cannot look down very well. (R. 66). She does not go to church as much as she used to, because she cannot sit and has to stand in the back of the church. Id. She goes to church "probably once a month" now. Id. She used to like to go watch movies, but she likewise cannot sit to watch a movie any more. Id. She used to have a "great big flower bed [she] always worked on," but has not been able to for the past couple of years because her hands are not strong enough to pull the weeds. Id.

## D.   Vocational Evidence

Also testifying at the hearing was Mary Beth Kopar a vocational expert.   VE Kopar characterized Plaintiff's past work at Mountaineer newspaper as a classified ad clerk, Dictionary of Occupational Titles (DOT) number 247.367-010; skilled work with a specific vocational preparation of five (5), and sedentary exertion in the DOT, but light exertion as actually performed. (R. 72).

With regards to Plaintiff's ability to return to her prior work, VE Kopar gave the following responses to the ALJ's hypothetical:

> Q:    Let's assume a hypothetical individual with the same age, education, and work background as the claimant who is capable of performing work at the light level as defined in the regulations. All posturals are occasionally, except never climb ladders, ropes, or scaffolds. The work should not require greater than occasional exposure to concentrated levels of extreme cold, wetness, humidity, vibration, or fumes, dust, odors, or pulmonary irritants. The work should not require exposure to unprotected heights or moving mechanical parts. Would such a person be able

> to perform the claimant's past work, either as she actually performed the work or as the work is generally performed in the national economy?
>
> A     Could do the past work, both per the DOT and as performed.

(R. 72-73).

Incorporating the above hypothetical, the ALJ then questioned VE Kopar regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels.

> Q     Could the hypothetical individual perform any other jobs, and if so, could you please give me a few examples with numbers of jobs in the nation for each occupation?
>
> A     Yes, your honor. Could do that of a sorter, DOT 222.687- 014, unskilled, SVP of 2, light exertion, with over 300,000 positions in the national economy. Could do that of an order caller, DOT 209.667-014, unskilled, SVP of 2, light exertion, with over 200,000 positions in the national economy. Could do that of a ticket seller, DOT 211.467- 030, unskilled, SVP of 2, light exertion, with over 200,000 positions in the national economy.

(R. 73).

> Q     Thank you. If I were to take that same hypothetical but I changed it to say that the hypothetical individual could stand and/or walk for four hours in, or sit for six hours in an eight-hour workday, would that change your testimony?
>
> A     Could still do the ticket seller and the order caller position. That would eliminate the sorter position.
>
> Q     Do you have one to replace the sorter?
>
> A     Could do that of a marker, DOT 209.587-034, unskilled, SVP of 2, light exertion, with over 100,000 positions in the national economy.
>
> Q     Now, would the ticket seller or the order caller, would the numbers of jobs available be degraded by the limitation I gave you?
>
> A     Yes, they would be reduced by approximately 50 percent, your honor.
>
> Q     Okay. So, ticket seller. And would the past work still be available?
>
> A     No. According to the vocational form completed, the past work could still be performed as she performed it.
>
> Q     Okay. So -- but not as per the DOT?
>
> A     Yes, per the DOT, because the DOT is sedentary.
>
> Q     Okay. Let's take that same hypothetical as number 2, except work should not require greater than occasional exposure to a noise intensity level above the loud level, as that term is defined in the Selected Characteristics of Occupations. Would that change your testimony?
>
> A     It would not with regard to the past work. And one second. It would not change my testimony, your honor.
>
> Q     And what if I were to change it to moderate?
>
> A     Those positions are performed at moderate.

Q        Okay.

A        So they could still be performed.

Q        And if I were to add to hypothetical number 4, which was at the moderate level, if I were to add [] in that the work must allow the individual to alternate in between sitting and standing at will, and by this I mean the ability to change from a sitting position to a standing position every 15 minutes if desired and vice versa. And that is every 15 minutes, if the person is sitting and experiences back pain, they can stand and stretch in place and continue working in the standing position if desired. Similarly, every 15 minutes if the person is standing and experiences back pain or tiredness, they can sit down to continue their work in a sitting position if desired. Would that change your testimony?

A        It would eliminate the past work, your honor. You could still do the ticket seller, the order caller, and the marker positions.

Q        Would the numbers be changed?

A        No. I had already reduced them.

Q        Yes.

A        Okay, yeah.

Q        Yes. And that would be off the reduced numbers?

A        Correct.

Q        Okay, if I were to take one last hypothetical, and – so I'm going to take hypothetical number 5, and I'm going to add to that that work should not require greater than frequent handling or feeling, would that change your testimony?

A        Could still do the marker, still do the order caller. It would eliminate the ticket seller.

Q        Would you have one to replace it?

A        An assembler, DOT 706.684-022, unskilled, SVP of 2, light exertion, with over 200,000 positions in the national economy. And I have already reduced those numbers.

Q        Okay. If I were to go back to hypothetical number 4, which was the hypothetical at the moderate noise intensity level but no sit/stand option, and in that hypothetical you testified that the claimant could do her past work --

A        I said could not do the past work.

Q        In number 4?

A        In number 4.

Q        And why was that?

A        Because of the alternate sit/stand at will.

Q        No, 5 was the sit/stand.

A        No, I had 4 as alternate sit/stand at will every 15 minutes. 5, I had the handling and

Q        Oh, that's because I did -- I did loud and then moderate, and I called the moderate my 4, and you said they stayed the same, moderate intensity level. So, 5 would have been the sit/stand option.

A        Okay. Sorry, I

Q        Okay, well, let me go back and -- let me just do the actual hypothetical, okay. So if I were to -- if I were to say a hypothetical individual, same age, education, and

work background as the claimant, who can stand or walk for four hours and sit for six hours in an eight-hour workday, and this is capable of performing work at the light level. All posturals are occasional except never climb ladders, ropes, or scaffolds. The work should not require greater than occasional exposure to concentrated levels of extreme cold, wetness, humidity, vibration, fumes, dust, odors, or pulmonary irritants. The work should not require exposure to unprotected heights or moving mechanical parts, and the work should not require greater than an occasional exposure to a noise intensity level above the moderate level as that term is defined in the Selected Characteristics of Occupations. And I want to add to that no more than frequent handling or fingering.

A Okay.

Q Would the past work be available.

A Wait, I need some clarification here. Because before, the way I wrote it down --

Q Okay.

A You're saying occasional exposure to noise?

Q No more than occasional exposure.

A The DOT doesn't really classify with regard to the frequency of the noise, it just indicates the noise level.

Q Okay, so no more than exposure to moderate.

A Okay. I just want to make sure I have this.

Q Okay.

A So we're at the moderate, but basically hypothetical number 1?

Q Yes. That's the only thing that's added to it, is the moderate. Well, and then the four hours and six hours.

A Yeah.

Q So that's how it's different than hypothetical number 1.

A So, could do the past work as performed and per the DOT.

Q And what about the other jobs? Which

A Could still do, in the -- could still do -- there's nothing with regard to the handling and fingering. The order caller, and the ticket seller, and the marker.

Q So those are still there.

A Yeah.

Q But would the numbers be the same?

A The numbers as I had quoted them in hypothetical number 2 -- no, that was for -- yes, the numbers would be the same. I'm sorry.

Q That's okay. I got you confused. So, let's go back for just a moment and back up. In hypothetical number 3, we talked about the noise intensity level above the loud level. I said no more than occasional exposure, but if I were to change that to say that it was no exposure to a loud work should not require exposure to a noise intensity level above the loud level, would your testimony be the same?

A Yes, because those positions were moderate or quiet, your honor.

Q Okay. And that way we pull it into the DOT. All right, how -- what is the customary tolerance for being off task and yet being able to maintain competitive employment?

A Off task no more than 15 percent of the workday.

Q And what about absences?

> A      Absenteeism for unskilled, entry-level work is missing no more than one day per
> week -- per month, for semi-skilled up to two, and for skilled, three to four.
> Q      So, was it one day per month, or one day per week?
> A      One day per month.
> Q      Okay. And then for semi-skilled, I'm sorry, what was it?
> A      Up to two, and for skilled, three to four.
> Q      Okay.

(R. 73-79).

> ALJ:   All right, Ms. Kopar, has your testimony been consistent with the DOT?
> VE:    Yes, your honor, with the exception that the DOT does not address the sit/stand,
> nor does it address absenteeism or off task. That's based upon my 20-plus years of
> case management, doing job placement, labor market surveys, onsite job analysis,
> and vocational seminars.
> ALJ:   Thank you.

(R. 80-81). Plaintiff's representative had no questions for VE Kopar. (R. 80).

## E.    Report Forms

On a Work History Report Form, Plaintiff stated she had worked in newspaper classifieds

from February 1997 to September 2013. (R. 225). In this job, she sold advertisements on the

phone, typed "legals" and classified ads, handled walk in customers, took money payments, and

did outside sales. (R. 226). This job required her to use machines, tools, or equipment; use

technical knowledge or skills; and write or complete reports. Id. She worked eight hours per day,

five days per week. Id. Each work day, Plaintiff stated she walked for six hours, stood for two

hours, sat for three hours, stooped for three hours, kneeled and crouched for one hour, and

reached, wrote, typed, or handled small objects for six hours. Id. During the day, Plaintiff lifted

and carried her sales bag and heavy composing folders as well as two address books. Id. The

heaviest weight she had to lift was twenty pounds, and she frequently lifted less than ten pounds.

Id. She supervised three people in this job and was a lead worker, but was not responsible for

hiring or firing any employees. Id.

On October 1, 2913, Plaintiff completed a Personal Pain Questionnaire (R. 245). She reported continuous pain in her neck and upper shoulders, which she described as aching, stabbing, burning, stinging, and throbbing. Id.  Plaintiff stated that nothing in particular really causes her pain, as it is always there. Id.  Sometimes heat makes it feel better. Id. She takes pain medications up to four times per day (R. 246); Hydrocodone "helps some but not fully." (R. 245). She was also receiving Embrel injections twice a week, but reported that it never helped. Id. She stated that completing the form had made her hurt "real bad" as it required her to sit, write, and look down. Id.  She also reported being unable to stand, lay or sit for long. Id.

Plaintiff also reported pain in her upper, middle, and lower back, lasting all day. (R. 246). She described this pain as aching, stabbing, burning, stinging, and throbbing. Id. This pain is made worse by things like mopping, vacuuming, standing for too long, looking down or sitting. (R. 247). The pain sometimes is relieved with heat and ice. Id.

Plaintiff also reported pain in her fingers and wrist, which she described as aching, burning, stinging, and cramping. (R. 248). She has this pain three times per hour, usually lasting for two hours. Id. When she has wrist and finger pain, she cannot pick up a pen or paper, drops things she tries to pick up, and cannot carry heavier things "like a bowl filled up." Id. This pain is made worse by things like writing and doing dishes. Id. Rubbing her fingers and wrist helps it feel better "some," as well as IcyHot rub. Id. In the narrative section for remarks, Plaintiff added:

> My knees, hips, [and] feet hurt at times – not both knees at [the] same time. My feet [and toes] burn and ache. Some days [my] heels and bottom of feet hurst so bad I can't walk [and I] soak [them] in warm water [with] bubbles. My hips hurt from time to time. This makes me sound bad but it also made me see the full picture at the time. I honestly hurt all day [and] wake up in [the] middle of the night, hurting real bad. Filling this out was tough [and] I hurt all over from sitting, sitting [and] looking down.

(R. 249).

On a Report of Contact form dated December 20, 2013, DDS interviewer Christine Sias contacted Plaintiff to discuss her memory and concentration problems at the request of the psychological reviewer. (R. 258). Plaintiff reported that she has been in stores and forgotten what she went there for, and has called clients to ask about placing an ad and been told that they talked about it the day before. Id. Her family is concerned about her increasing forgetfulness and told her she has asked them questions she had already asked earlier in the day. Id. Plaintiff reported that she thinks forcing herself to work affected her concentration; since she stopped working, she has been told that she seems better. Id. Since she stopped working, she has been able to pace herself according to how much pain she is in. Id. As to psychological issues, Plaintiff told the interviewer that she started taking Celexa after her hearing loss diagnosis, as it really upset her; she was subsequently diagnosed with rheumatoid arthritis and fibromyalgia. Id. She stated that she "was not really depressed, but the medicine helped her." Id. She had never seen a mental health professional or had a psychological hospitalization. Id.

They also discussed her prior work, with Plaintiff reiterating the information on her Work History Report. (R. 260). The DDS interviewer noted:

> HER RFC IS SET AT LESS THAN LIGHT. ALTHOUGH SHE ALLEGES PAIN, SHE DID NOT HAVE SWELLING, TEND[E]RNESS OR JOINT DEFORMITY OF HANDS OR WRISTS AT THE CONSULTATIVE EXAM. SHE HAD GOOD GRIP AND FINE MANIPULATION AT THE CE. THERE FORE SHE WIL BE RETURNED TO PAST WORK AS DESCRIBED IN THE NATIONAL ECONOMY.

Id.

F.     **Lifestyle Evidence**

On October 1, 2013, Plaintiff completed an Adult Function Report form. (R. 250-257). She stated that her hearing loss affects her ability to do her job because it requires talking on the

phone and she cannot hear well, even with hearing aids. (R. 250). As to the impact of her

physical conditions, Plaintiff elaborated that:

> After running to the copier, fax, printer I find it hard to sit much, but standing causes a lot of pain to [sic]. I go home during the day to find relief by sitting [and] standing [and] crying when no one is looking. I can't pick up my binder for the meeting often. My wrists are weak and keep me from picking up! . . . The arthritis settles in my neck [and] upper back, causing headaches [and] a lot of pain that I can't bear. Hydrocodone helps, but doesn't always take the pain completely away.

(R. 250, 257). As to her daily activities, Plaintiff stated that she does sometimes feed and water

their dog and cat; however, when she is "hurting and can't bend down," her daughter comes over

to feed and water the pets. (R. 251). Her husband grooms, bathes, and walks the dog. (R. 251).

Plaintiff stated she sometimes has insomnia; when she does sleep, aching and burning in her

back and neck causes her to wake two or more times in the night. Id. Plaintiff reported no

problems with personal care at that time. (R. 251). Plaintiff makes herself oats or cereal for

breakfast; because she is diabetic, she has to watch what she eats. (R. 252). Plaintiff reported that

she prepares meals daily, and that "all other meals are at least 3 course[s]." Id. However, it takes

her "much longer" now to make them than it used to. Id. Plaintiff stated she can do some

housework, but not all of it; her daughter and husband help her. Id. She reported doing laundry

because the machine is on the same floor. Id. However, vacuuming and mopping the floor are

difficult and she has to stop and rest, or get her daughter to come do it for her. Id. She does not

do any yard work. (R. 253). Plaintiff reported going outside daily. Id.  She goes shopping "as

quick as [she] can [because she] can't say out long" due to rheumatoid arthritis attacks that leave

her barely able to move. Id. Plaintiff stated that she has a Keurig brewer for coffee because it is

hard for her to lift and pour a coffee pot in the morning. (R. 251). Plaintiff reported being "okay

with" doing her hair, but at times, Plaintiff's daughter has done it for her sometimes, when she is

unable to move her wrists and fingers. Id.

Her hobbies and interests included reading, watching television, "lov[ing] on" her animals, visits from her daughter, all of which she does daily. (R. 254). Since her conditions have begun, those activities have changed in that her daughter has to visit her more than she visits her daughter now, because her daughter's home has steps that are painful for Plaintiff to walk down. Id.  She used to play with her pets, but now just mainly pets them. Id. As to social activities, Plaintiff state that she visits with family, meets her friends in restaurant for coffee maybe once a month, and calls her family on the phone every day. Id. She reported going to church every Sunday, to WalMart "maybe [three times per] week," to the bank, and to her sister's maybe once a month. Id.  Plaintiff explained that before her conditions worsened, she used to visit friends at least once a week and used to walk trails with her husband every other day. (R. 255). Plaintiff stated that her husband "goes alone now – before his accident" because the hills are harder to climb.  Id. Plaintiff also used to be able to do aerobics and taebo, carry heavy things (R. 251), hear well, walk to work, stand long enough to cook without pain, vaccuum and mop her kitchen with ease. (R. 257).

Plaintiff reported that her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, hear, remember, complete tasks, concentrate, and use her hands were affected by her conditions. (R. 255). She explained that:

> Lifting is harder due wrists + fingers weak [sic], back hurts to bend, reach, stand, walk, sitting, stair climbing. Hips hurt w[ith] walking, kneeling hurts w[ith] knees pain at times + hips weak to get back up [sic]. Seeing – my eyes getting worse due to RA.

Id. Plaintiff stated she could walk twenty-three steps before needing to stop and rest for a couple of minutes. (R. 255). She reporting being "good at paying attention," finishing what she starts, and following written instructions "well." Id. She reported that her memory "seems to be not good" when it comes to following spoken instructions, and she has to write new things down. Id.

She reported getting along with authority figures well, and never having been fired or laid because of problems getting along with other people. (R. 256). She reported handling stress and changes in routine "well." Id. She reported unusual fears of falling and getting hurt, and broken bones not healing. Id. She reported using hearing aides and glasses daily. Id. Plaintiff reported taking Embrel injections, Hydrocodone, and Triamterene. (R. 257).

Plaintiff completed a second Adult Function Report on February 4, 2014, approximately four months later. (R. 270-77). She reported by then that on some days, she cannot hold a zipper to dress herself, hold a curling iron to do her hair, or hold toilet paper to wipe. (R. 271). She reported having fallen in the shower because she stood too long and her back gave out. Id. She still prepares her meals, but at that point she was preparing "mostly sandwiches and chips." (R. 272). She reported still reading and watching television, though stated it was painful to hold a book for too long. (R. 274). She still went to church on Sundays if she felt like going, visited with others primarily by phone three days per week; went to doctor's appointments once per month; went to her sister's house once per month, and went to the grocery store two or three times per week." Id. Plaintiff stated she could now walk thirteen or fourteen feet before stopping to rest for a couple of minutes. (R. 275). She handles stress well when she is doing good, and handles stress poorly when her conditions flare up. (R. 276).

E.      Other Evidence

On June 24, 2014, Jean Metz wrote a letter regarding, in relevant part, her observations of Plaintiff at work as Plaintiff's boss since 1999 at the Mountain Statesman Newspaper office. (R. 307). Ms. Metz stated that Plaintiff had "a very hard time hearing and understanding what was said," and had asked Ms. Metz to "always be facing her when speaking [] so she could read my lips." Id. Ms. Metz stated that Plaintiff had "missed a lot of work, in order [] to go to

Morgantown and have [her hearing aides] adjusted, but they never did help her hear well [and] she was depressed over that." Id. When speaking to customers on the phone, Plaintiff "had to have people repeat a lot and she spelled what she thought she heard." Id. "Donna's time on the phone was very frustrating." Id. Ms. Metz "believe[d Plaintiff's] hearing had gotten worse over the years, even with the hearing aides." Id.

As to Plaintiff's arthritis and pain, Ms. Metz stated that there were many days that Plaintiff "could hardly function:"

> She would come to work and look like she was in so much pain, that no one should be up walking around, let alone be at work. When she got up to do business for her customers, she would sometimes be bent over and it would take some time to straighten up. There were many days, that she could hardly walk, so her co-workers would fax or copy things for her. Many times, they would go to the printer, and take her work off and give it to her, because she was in so much pain, and walking was impossible. Some days, her fingers and wrists hurt her so bad, that she couldn't hold an ink pen. Working in a newspaper business, selling ads, there are tons of paperwork. She had to hold her pen a different way, in order to grasp it, and on certain days, that didn't help.
> She hated to miss work, but from time to time, l would insist she go home and find something to help her with the chronic pain and she would finally go. Pain pills, pain patches and hot and cold presses helped sometimes, but when her days were real bad, all of those just took the edge off, but left her still unable to move. Her daily regime on pain medication, kept her going, however, when her arthritis flared up, nothing helped. It got to the point, right before she finally accepted the fact that her Arthritis is getting the best of her; everyday tasks were almost impossible. She left through the day, more often. She'd sit at her desk and you can tell that her chronic pain was winning that day. Sitting, standing, walking, laying down, nothing relieved the pain. She just had to suffer through it and that hurt all of us in the office. We hated to see her that way.
> Donna would always put up a brave front, so people would not know the pain that she was going through, but I knew. When you see someone everyday, you just know. When she came to me and said that she thinks it time for her to quit her job, of 17 years, to go on disability, instead of pushing herself through such painful days, I already knew she should have done that, years ago.

(R. 307).

The record also contained a letter from Plaintiff dated April 20, 2016, which generally recounted her medical treatment history and records. (R. 311).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   <u>ADMINISTRATIVE LAW JUDGE'S DECISION</u>

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.   The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits throughout the period at issue herein, i.e., since the .July 30, 2013, date of alleged disability onset.

2.   The claimant has not engaged in substantial gainful activity at any time during the period at issue (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.   During the period at issue, the claimant has evidenced the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: multilevel (cervical, lumbar, and thoracic) degenerative changes of the spine; and minimal osteoarthritic changes of the right wrist (20 CFR 404.1520(c) and 416.9209c)).

4.   During the period at issue, the claimant has evidence no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   Throughout the period at issue, the claimant has had the residual functional capacity to perform a range of work activity that: requires no more than a "light" level of physical exertion with a further limitation to standing/walking no more than four hours within an eight hour workday; requires no climbing of ladders, ropes or scaffolds, no more than occasional performance of other postural movements (i.e., balancing, climbing of ramps or stairs, crawling, crouching, kneeling or stooping); requires no more than occasional exposure to concentrated levels of extreme cold, wetness, humidity, vibration or pulmonary irritants (e.g., fumes, dusts, odors); and requires no exposure to unprotected heights, moving mechanical parts or noise at more than a "moderate" intensity level (as that term is defined within the Selected Characteristics of Occupations) (20 CFR §§ 404.1520(e), 404.1567(b), 416.920(e) and 416.967(b)).

6.    Throughout the period at issue, the claimant has remained capable of returning to her "vocationally relevant" past employment as a classified-ad clerk, either as previously performed by her or as generally performed within the national economy. She has also remained capable throughout such period of performing other jobs that are available in significant numbers within the national economy (20 CFR §§ 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, at any time during the period at issue herein, i.e., since the July 30, 2013 date of alleged onset (20 CFR §§ 404.1520(f),(g), 404.1568, 416.920(f)(g) and 416.968).

(R. 24-30).

# VI.    DISCUSSION

## A.    Standard of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual

finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contention of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is not supported by substantial evidence." (Pl.'s Mot. at 1, ECF No. 9).  Specifically, Plaintiff alleges that:

> 1.      The ALJ's failure to explain why she found Plaintiff limited to sitting for four hours in a workday instead of for six hours requires remand for explanation;
>
> 2.      That failure further caused the ALJ to fail to provide the VE with an accurate hypothetical;
>
> 3.      The ALJ erred in finding that no acceptable medical source indicated that Plaintiff suffered from depression and/or anxiety;
>
> 4.      This failure further caused error at steps two, three and four in the ALJ's evaluation of Plaintiff's impairments and limitations.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at [1], ECF No. 10). Plaintiff asks the Court to "remand for calculation of benefits . . . as a remand for any other purpose would only further delay [Plaintiff's] receipt of benefits." (Id. at 15).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1, ECF No. 11). Specifically, Defendant alleges that:

> 1.  Plaintiff's first argument lacks merit because it is based on a misstatement of the ALJ's RFC determination and an incorrect interpretation of the state agency opinions;

2. There is no merit to Plaintiff's argument regarding the hypotheticals at step five, because the analysis concluded at step four; moreover, because the VE identified jobs in response to a hypothetical that did set out all of Plaintiff's impairments, the outcome would not change regardless;

3. Contrary to Plaintiff's assertion, the ALJ did not find that no acceptable medical source had diagnosed Plaintiff with anxiety or depression; rather, the ALJ properly found that the nurse who had diagnosed Plaintiff with depression was not an "acceptable medical source" as defined by the regulations; and,

4. After so finding, reviewed the medical evidence as to depression and explained why she found that it did not constitute a severe impairment of twelve-month duration under the Act.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 9-15, ECF No. 12).

## C.    Analysis of the Administrative Law Judge's Decision

### 1.    The ALJ's RFC was not inconsistent with the Agency Reviewers' RFC

A claimant's residual functional capacity is the "most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545. When assessing a claimant's RFC, the Social Security Ruling 96-8p, 61 Fed.Reg. 34,475 requires an ALJ to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). It is only after the function-by-function analysis has been completed that the RFC "may be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Mascio, 780 F.3d at 636 (quoting SSR 96-8p).  The RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings)

and nonmedical evidence (e.g., daily activities, observations)."  Mascio, 780 F.3d at 636 (citation

omitted).  A discussion of the functional limitations in broad terms followed by an in-depth

analysis supporting the ALJ's function findings will satisfy the regulations requirement as well.

See Ashby v. Colvin, 2015 WL 1481625, at *2 (S.D.W. Va. Mar. 31, 2015).

Here, the ALJ determined Plaintiff had the residual functional capacity to perform work

that:

> requires no more than a "light" level of physical exertion with a further limitation
> to standing/walking no more than four hours within an eight hour workday;
> requires no climbing of ladders, ropes or scaffolds, no more than occasional
> performance of other postural movements (i.e., balancing, climbing of ramps or
> stairs, crawling, crouching, kneeling or stooping); requires no more than
> occasional exposure to concentrated levels of extreme cold, wetness, humidity,
> vibration or pulmonary irritants (e.g., fumes, dusts, odors); and requires no
> exposure to unprotected heights, moving mechanical parts or noise at more than a
> "moderate" intensity level (as that term is defined within the Selected
> Characteristics of Occupations) (20 CFR §§ 404.1520(e), 404.1567(b), 416.920(e)
> and 416.967(b)).

(R. 27).

Plaintiff first argues that, per the Commissioner's regulations and Plaintiff's age, Plaintiff

"would be deemed 'disabled' if she was limited to either A) sedentary, unskilled work or B)

sedentary work [and skills from] prior work were 'not transferrable' to other sedentary work."

(ECF No. 10 at 6). Plaintiff next argues that the SSA reviewers upon which the ALJ relied found

Plaintiff could perform at most sedentary work, based on their RFCs showing that she could

stand for up to four (4) hours, and sit for about six (6) hours in an eight-hour workday. Id. As a

result, Plaintiff takes issue with the ALJ's finding that Plaintiff could sit for four hours per day,

without explaining why her RFC differs from the agency reviewers'. Id. Plaintiff alleges that the

ALJ erred because her "RFC does not include a limitation of sitting for up to 6 hours," and is

thus at odds with the agency reviewers. (ECF No. 13 at 1). Defendant argues that Plaintiff is

mistaken because, simply put, the ALJ did not limit Plaintiff's ability to sit. (ECF No. 12 at 10). Rather, the ALJ stated only a limitation to standing/walking, no more than four hours within an eight-hour workday. (Id., citing R. 27).

Plaintiff's claim that the ALJ's RFC needed to include a "limitation of sitting for up to 6 hours" in order to be consistent with the agency reviewers upon whom she placed great weight (ECF No. 13 at 1) is somewhat puzzling. The undersigned does not understand that to be an accurate statement of the agency reviewer's findings.

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity, which is 'the most' the claimant 'can still do despite' physical and mental limitations that affect her ability to work. § 416.945(a)(1)." Mascio, 780 F.3d at *635; SSR 96-08p (An RFC is "not the *least* an individual can do despite his or her limitations or restrictions, but the *most*."). Accordingly, when the SSA reviewers opined that Plaintiff could "sit (with normal breaks) for a total of "about 6 hours in an 8-hour workday," the reviewers were not opining that Plaintiff must be able to sit for six hours. (R. 90, 115). Rather, they were opining that the *most* Plaintiff could sit was for about six hours in an eight-hour workday. Likewise, when the SSA reviewers opined that Plaintiff could "stand and/or walk (with normal breaks) for a total of 4 hours," they were opining that the *most* Plaintiff could stand or walk was for four hours in an eight-hour workday. This is further confirmed in the narrative explanation, wherein agency reviewer Gajendragadkar wrote "Cannot lift [more than] 25 lbs. **Able to stand 4 h[ou]rs in an 8 h[ou]r workday**." (R. 90) (emphasis added).

An interpretation of what the SSA reviewers opined consistent with the regulations cited above and their own statements is that Plaintiff could do work that required her to stand for no more than four hours in an eight-hour workday, or sit for no more than six. That would

encompass jobs that required Plaintiff to stand for four hours and sit for four hours in an eight-hour workday, or stand for three hours and sit for five; or stand for two hours and sit for six. Four hours of standing and walking is simply the ceiling of Plaintiff's capabilities as assessed by the SSA reviewers. The undersigned therefore disagrees that Plaintiff was limited to work that requires sitting for six hours, as Plaintiff contends. (ECF No. 13 at 2). Likewise, the undersigned disagrees that there was any requirement that the ALJ's RFC limit Plaintiff to be seated for six hours. The undersigned disagrees that the total of any of these combinations shift the consideration from an eight-hour workday to a ten-hour workday. There is no basis in fact for that contention.

Rather, the ALJ's RFC began with light work because Plaintiff's ability to occasionally lift and carry twenty pounds and frequently lift and carry ten pounds fell into the light – and not sedentary – range of work. Light and sedentary work are defined as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567, 404.967. However, because the ALJ found that Plaintiff could not stand and walk as often as required for light work, the ALJ appropriately found Plaintiff to be capable

of performing a *limited range* of light work, limited specifically in that she could stand and walk for no more than four hours. (R. 27). The undersigned has found no error here.

### 2. The ALJ's finding that depression was not a severe impairment was not based on the lack of diagnosis by an acceptable medical provider.

Plaintiff second argument is that the ALJ erred by discounting Plaintiff's mental conditions and impairments because these were not diagnosed by an acceptable medical source, when the face of the record shows that she was. (ECF No. 10 at 12-13) ("For instance, Dr. Dana Nugent, a psychologist, diagnosed [Plaintiff] with Major Depressive Disorder, Moderate." citing R. 533). Defendant argues that Plaintiff has again misstated the ALJ, because "the ALJ did not find that no acceptable medical source had diagnosed her with anxiety or depression. Rather . . . the ALJ correctly found that Nurse Lipscomb, who diagnosed Plaintiff with depression (Tr. 488), was not an acceptable medical source as defined by the controlling regulations." (ECF No. 12 at 14). Defendant argues that the ALJ then went on to consider the medical evidence relating to Plaintiff's depression and explained why she found it to be non-severe, citing the evidence of record. Id.

A review of the ALJ's decision compels the undersigned to agree with Defendant. Although the ALJ did indeed note that a nurse practitioner is not an acceptable medical source to establish an impairment under 20 C.F.R. §§ 404.1513(a) and 416.913(a), she went on to explicitly recognize that Plaintiff "saw a qualified medical source [on] May 28, 2015." (R. 26). Rather, the ALJ's decision was based in part upon her opinion that Plaintiff had failed to establish that "persistently affected and significantly limited" her sufficient to meet the severity and twelve-month duration requirements. (R. 26). The ALJ further cited Dr. Nugent's characterization of Plaintiff's depression being "low end due to [only] moderate symptoms;" no psychological limits on daily activities; no more than mild limitations in social functioning,

35

concentration, persistence, or pace; and the fact that psychological evidence obtained after agency reviewer Bickham completed her review did not contraindicate Bickham's findings. (R. 26). As a result, the ALJ's decision was not based on the lack of diagnosis by an acceptable medical source. The ALJ clearly recognized that an acceptable medical source did treat Plaintiff for depression, but observed that that acceptable medical source's evidence did not support a sufficient level of severity, nor did it support the duration requirement.

Although Plaintiff argues that her psychological condition limits her ability to sustain concentration (ECF No. 10 at 14, citing R. 538), the undersigned has found no articulated limitations to concentration on that page of the record. Nor did the undersigned locate any opinion as to the limitations on Plaintiff's concentration from USC personnel including treating source Nugent, or indeed any psychological source excepting agency reviewer Bickham, who opined such limitations were "mild." (R. 88). Certainly, Plaintiff's depression could have worsened in recent months. However, in absence of any specific psychological limitations to contradict those found by the agency reviewer, the undersigned fails to see how the outcome as to limitations would be any different, even if Plaintiff's depression had been found to be severe, and even if it had been found to meet the duration requirement (neither of which are the case).

Although Plaintiff's arguments on this point are brief and contain no specific citation in support of this contention, the undersigned finds it useful to contrast Plaintiff's situation here with that in Mascio. In Mascio, the Fourth Circuit found an ALJ's decision unsupported by substantial evidence when he failed to include limitations associated with a condition he *had* credited (adjustment disorder). 780 F.3d at *637-38 ("the ALJ did not consider her mental limitations despite crediting at step three Mascio's diagnosis or an adjustment disorder and also finding that Mascio had moderate difficulties in maintaining her concentration, persistence, or

pace as a side effect of her pain medication."). Here, the ALJ did not find more than mild limitations to concentration, nor does any other psychological source appear to have found more than mild limits to concentration, agency reviewer or otherwise.

### 3. The ALJ's decision does not lack substantial evidentiary support on these grounds.

Lastly, Plaintiff contends that there is no substantial evidence to contradict a finding of sedentary work, and that the ALJ improperly discounted evidence that her psychological conditions limited Plaintiff's concentration because "the record did not contain an acceptable medical source diagnosing such psychological impairments." (ECF No. 10 at 14-15). As the rationales and bases of Plaintiff's third argument do little more than rehash her first two arguments, neither of which have merit, this third argument likewise does not have merit.

Moreover, as Defendant points out, there are two reasons why the outcome would not change even if Plaintiff had been correct. First, the ALJ found at Step Four that Plaintiff could return to her past work. Because Plaintiff has failed to raise any cognizable issue with the ALJ's RFC, that precludes any step four error. Second, for every hypothetical posed to the VE, *including* the hypothetical that contained the four hour standing and walking limitation, the VE was able to name jobs that the Plaintiff could still perform. Therefore, in the absence of any successful challenge to the RFC,[3] which Plaintiff has not done here, Plaintiff would not prevail at step four *or* step five.

---

[3] Given that the duration requirement would presumably not be a similar obstacle were Plaintiff to reapply, and given that the regulations governing acceptable medical sources also changed for claims filed on or after March 27, 2017 (see POMS DI. 22505.003), it is important to emphasize that the conclusion of report and recommendation is limited only to those issues raised by Plaintiff. This report and recommendation does not conclude that the ALJ's decision is not questionable in any respect, as it generally leaves much to be desired. For example, the one thing Plaintiff is correct about is that the *reason* for Plaintiff's depression is irrelevant to the diagnosis or functional limitations (ECF No. 13 at 8). Although the ALJ improperly suggests that the fact that Plaintiff's pain and deteriorating physical condition is driving her depression is somehow relevant, which it is not, that error still does not affect the fact that the record does not contain more than mild limits articulated by a psychological source.

## 5.  <u>RECOMMENDATION</u>

For the reasons herein stated, I find that Plaintiff has not raised any meritorious arguments to the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 11) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the

---

Rather, two overarching arguments that Plaintiff has raised for this Court's consideration were unfortunately premised on a misunderstanding of the record; as such, *those* arguments fail.

District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this January 30, 2018.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE